So, we'll go ahead and hear argument now in the final argument set for this morning Doe v. Meta Platforms, Case No. 24-1672. Mr. Perlstadt. Good morning, Your Honors. May it please the Court. My name is Roger Perlstadt. I represent plaintiffs' appellants Jane Doe 1 and Jane Doe 2. I'm going to try to reserve about five minutes of time for rebuttal. I thought I would start with the statute of limitations discovery rule and then move on to some of the alternative grounds for affirmance proffered by Meta, although I'm happy to proceed however this Court wants to proceed. So with respect to the statute of limitations. Can I just ask one question? Is your ultimate position as to the alternative grounds that we should simply remand to the District Court? Yes. It's this Court's practice to not... Well, it's a practice sometimes and not a chance, but that's what you're asking. That's our position. Yeah. Reverse on the statute of limitations ground, send it all back to the District Court. And with respect to the statute of limitations, California's discovery rule exists to protect the quote, blamelessly ignorant. And I think you'd be hard-pressed to find two more blamelessly ignorant, two plaintiffs more blamelessly ignorant of their claims than Jane Doe 1 and 2 here. They are members... Where does the blamelessly ignorant come from? That's from Kernan, California Appellate Court, Kernan, 2022. Plaintiffs here are members of a persecuted ethnic and religious minority, long denied education and other basic resources. Their villages were attacked by government forces and civilian militias. They escaped, embarking on a harrowing years-long journey to resettle in the United States, which included for Jane Doe 2, a three-year stay in a Thai detention facility. They are unable to read and write in their own language, unable to speak or understand English. What does that mean? Say the lawyers didn't go down there and talk to them until 10 years from now, 20 years from now. The statute of limitations would have been told that entire time? I think if it's reasonable for these plaintiffs not to have discovered their cause of action against META, then yes, or at least that gets to a jury. This court has repeated... But it doesn't, I mean, that doesn't apply to anyone else. I mean, if I have a claim and I just don't know about the claim, an attorney comes to me after the statute of limitations and tells me I have it, I would have a claim. You don't get told. Is there a case in California that says that it's told just because you didn't, I mean, you knew the facts. Well, actually... We knew some of the facts. That's a question. That is a question. So let me get at it this way. There are two things that META points to that they say trigger the statute of limitations or at least inquiry notice here. One of which, the first one they say is the attacks on the villagers. You knew that you were attacked. You knew that that was wrongdoing. But claims against different tort feasors based on different legal theories can arise at different times. And so that's cases like Fox v. Ethicon, for example. That's California Supreme Court, where a plaintiff is injured by their surgeon's malpractice And that doesn't trigger inquiry notice that maybe a medical device manufacturer's negligence was also a substantial factor in their injury. EFAB, Evans, those are two similar cases. EFAB accompanies knowledge of an employee's... I'm just trying to parse this out. It's not really the claim that they... Your argument isn't so much that they didn't know that they had a legal claim, but they didn't even understand that these other comments were being made on the internet such that that could have... Are you talking about the 2018 public... Yeah. The material... Right. Those don't trigger inquiry notice to these plaintiffs either, because under California law there's no rule of constructive suspicion. So the statute of limitations doesn't begin to run when some members of the public might know of something. It's only when... Once the plaintiff has suspicion of wrongdoing. That's cases like... The only thing... I mean, all of your arguments, I think, do match up with California case law. The problem is, I guess, the one that Judge Nelson alluded to, that for these particular plaintiffs, I'm assuming that they never went to a lawyer. A lawyer came to them. And if the lawyer had come five years later, would that still be the case? And yet there seems to be no stopping point. That's the problem. I think maybe that's where the jury question comes in. It's... We've alleged facts that we suggest made it reasonable for these plaintiffs... Well, but I'm sure they're all true, actually. And there's no way these... I mean, if they can't read and write in any language, how would they know what's going on in the internet? They never would know unless somebody told them. I think perhaps statutes of repose would be the answer to your question. If there are statutes of repose, at some point MEDA gets reposed whether or not the discovery was a lie. But this isn't a statute of repose. I'm sorry? No statute of limitations. I know. It's not a statute of repose. It could be, but... But my concern is... You could write one. Yes, you could have one. But you're saying California currently doesn't have that and they could be facing these claims 50 years from now. If that's... My answer is, the answer to your concerns about could this be 50 years later is statute of repose. But under California law... Right, there isn't one. So you're just saying it's California law... Well, what about latches? There might be a latches issue. There may be latches. Well, but how would latches apply if the theory is we didn't know about it until an attorney came and sat down with us? I mean, I don't know how you would... I mean, I don't know. Maybe you would apply latches to the attorneys? Yeah, but the tail end of latches is reliance by the person now being sued 50 years later. So there's a reliance issue that comes in in latches that doesn't exist if you're just doing statute of limitations. I'm just going with, as you said, I'm... Because, in fact, I mean, in terms of prejudice to MEDA, there probably isn't any. I mean, although usually limitations are about the lapse of access to evidence and so on. I mean, all this evidence is sitting there on the internet. It's not going to be a problem accessing it. So in that way, there's... In a latches sense, there's probably not a problem as to MEDA. And we're not talking about long periods of time here. These are a few years... Well, it's still a pretty long period of time, depending on how you look at it. So the basics is that the Facebook post, right? You sort of suggested that it wasn't just that, I thought. The basis for their claims or how they were... Yeah, the claims here are really the... I mean, isn't your point that the introduction of Facebook was such a significant inflection point that... And they couldn't understand that. And then when that was explained to them, that's when they... Their villages are attacked. In the middle of the night, they're fleeing for their lives. They have no clue that a US social media company may have some responsibility for this. No, that's a separate... I mean, the underlying claims are a little attenuated. But I mean, I guess my point is, if they... All they knew was they were being attacked and that was going on. I mean, that's been happening long before Facebook ever came on. I mean, these tensions, this isn't something new that's been fomented by Facebook. Am I right about that? I think Meta overstates our complaint on that ground. We do allege that this was... They've been long... There's been sort of longstanding persecution and some sporadic violence. But we allege that, as you noted, we allege that Facebook's introduction into Burma was a key inflection point in the treatment of the Rohingya, turning sporadic violence into widespread mob action, widespread genocide. That's paragraphs 14 through 27 of the First Amendment complaint. But if Facebook was so integral to that, if the Facebook posts were so integral to this change, as you suggest, don't you think that even if they were illiterate, that they would have... I mean, the discussion would have gotten around that, oh yeah, we wouldn't have done this except that we coordinated, and they would have heard that their enemies were coordinating through Facebook and being driven by that? No, I don't think so. And again, not to sound like a broken record, but I think that's the kind of thing that a jury gets to decide, that a jury gets to decide, yeah, of course, maybe they should have heard it somewhere, somehow. But I think we get to get there to a jury. We have alleged... There's no dispute that they didn't learn of this until shortly before filing their suit. There's no dispute on that. Actual discovery is not an issue. So the question is, when was it reasonable for them to have discovered, or were they diligent, were they reasonably diligent? And that's... This court has repeatedly said that that's a jury question. Trimble v. Moss, Nevada Power Company. And the California case law is clear that it depends on the individual's circumstances. Is that right? Correct. The individual... What the individual knows. So things like... The fact that literate... I mean, the point here seemed to be that META came into Burma and flooded... And sold all these... And put their Facebook on all these cell phones and just flooded the market with it. So most of the people in Burma would at least know that META was there, and that it was... And that Facebook was there, and that... I think most of the ethnic Burmese majority would know. I think most of the ethnic Burmese majority would know that. I'm not sure that the ethnic minority Rohingya would know that. It's a bit of a stretch to say that we can say without any doubt that illiterate village women would have understood how the computer system works, that META is now available on the internet. I mean... Correct. It seems a stretch to say that they would have known. And I agree with you that that's a factual question. Sure. Thank you. And we specifically allege that. We specifically allege that this connection between Facebook and the violence was not known... Well-known within the Rohingya community. So let's say that we agree with you that there's a problem on the statute of limitations. Your position is to send it back. On the 230 question, I mean, that's a purely legal question. And so I'm wondering why we wouldn't just grapple with it. Now, and so I guess I'm asking you to address the merits of the 230 because, I mean, you may have read some of my opinions and know that I'm very skeptical of 230 and what it's done. But this, and I want you to respond to this, but this seems to fit right within the sweet spot of what 230 was intended to protect. And so why don't you tell me why that's not true? Absolutely, Your Honor. So with respect to 230, I think it's important to understand in this case, this is not a to Section 230 arguments. The first being, we don't believe the CDA immunizes metis conduct here, and I can address that in a second. But just to be clear, our second argument is that even if the CDA does immunize metis conduct, that creates a conflict with Burmese law, California choice of law inquiry would point to the application of Burmese non-immunity law. That's a really complicated, fact-intensive inquiry, which is why I think this court should not address it on the... It's not fact-intensive. It's a legal question. Well, it's sort of determining the content of foreign law is sort of this flexible inquiry. I mean, we haven't really been given too much help on that. So if we were to do that, maybe we'd have to have more briefing on it. And it does seem interesting to me and possible, at least. The response seems to be that because it's federal law, that California choice of law can't eliminate the operation of federal law. But doesn't that happen all the time? Doesn't California choice of law trump U.S.? Yeah, it does happen all the time. It happened... We cite the Basiji case, and we cite the Studd case. And in the Basiji case, for example, this court engaged in a California choice of law inquiry to determine whether U.S. or Hong Kong law applied to a contract involving investments in Iran that U.S. law would bar. And the court did not, as Meta suggests it should do here. The court didn't simply say that, well, California choice of law rules can't trump U.S. law. We have to apply the U.S. sanctions law. The court engaged in a California choice of law analysis. I mean, it could be that the California choice of law analysis would take into account a strong federal interest. Absolutely. Exhibited in 2030. Absolutely. And we did brief that below. And it's docket 35 below. It's actually in the supplemental excerpts of record SER 109, our brief on the California choice of law analysis, if this court wanted to look at it. But again, I think that's another reason why this court shouldn't weigh in on it. There's a lot going on. It's not a pure question of, does the CDA law apply here? Should we apply Dairov? Without that question. Yes. Leaving aside Judge Nelson's suggestion, and as you probably also know, I just entered or concurred in Google, but I concurred because it seemed to me clear that Dairov and other cases, and now later ones since then in this circuit, seem, although I disagree with it, to regard what you call the enhancement aspects of Facebook's communication system as part of the Rule 230 immunity. So, I mean, what room, what daylight is there between Google and the post-Google cases and this one in that regard? In that regard, I think the material contribution point is our strongest distinction there. And we allege that Metta materially contributed to what made these third-party posts harmful, tortious, unlawful. In what way? But that was true. In Google, Google was about the terrorists, ISIS and other terrorists, and the allegation was that YouTube was sending out suggestions saying, if you like this terrorist video, you'll probably like that terrorist video. And some of them were even more disturbing than the ones that they had gone through to begin with. So how is that different from what you're saying? This court in Gonzales v. Google said, quote, the complaint does not allege that Google's algorithms prompted ISIS to post unlawful content. And that's the distinction. We allege that Metta's algorithms prompted the posting of unlawful content. That's the information that came mostly from the Francis Haugen memo and the Francis Haugen testimony. That's sort of a causation problem. That's not a Section 230 problem. Well, but the point is that our allegation is that these algorithms, this dopamine feedback loop that we talk about where Metta encourages the posting, people to create more and more violent posts, that that is a material contribution to what made the content unlawful. I think it's very similar to a case out of the Seventh Circuit, Huon, where in Huon, the Seventh Circuit said a company can be liable for inducing another to post a defamatory statement in a form that the company maintains. So in Huon, the plaintiff had sued a website for defamation based on third-party comments on the website. And the Seventh Circuit said no CDA immunity because the plaintiff had alleged that the website had, among other things, encouraged the most defamation-prone commenters to post more comments and continue to escalate the dialogue. But perhaps I just know too much about the Google case because I was there, but that's not how I understood it. You're fomenting the... I think it's a very nuanced distinction, but I don't think the fact... The problem is this case just does not seem like the case to move the ball against 230. I mean, it just seems so attenuated here. Are you talking about the causation issue, the attenuated causation? I think the causation, again, broken record, causation is generally a jury question. And I agree. It's not necessarily direct, but we allege two main steps in the causal chain. We allege that first principle step... It goes back to algorithm stuff, though, right? Yeah, it goes back to the algorithm. I mean, you're not claiming that there was somebody back at Facebook saying, oh, this would be a good idea. Of course, we don't think Mark Zuckerberg wants to foment genocide.  And so your claim is really at some point they knew about this and didn't step in to correct the algorithm that was going out. They know these algorithms are dangerous and they didn't step in. And had they not used these algorithms, and they weren't using these algorithms until before 2009. It's not that the algorithms were... I'm sorry? It's not that the algorithms, as I understand your argument, it's not that the algorithms themselves were dangerous, but that in this context they were creating a dangerous situation. Respectfully, our allegation is that the algorithms are dangerous. In general? In general. Because the algorithm was actually substantively highlighting dangerous posts? Yes. In this instance. But presumably the algorithms were operating on, they were promoting more attractive or more invigorating posts, but that could be sexually or it could be something else that's not dangerous to anybody. But this is, you're saying, but this hasn't operated in this circumstance and it was dangerous. Our allegation is that the way Meta's algorithms work, and we're operating clearly without the kind of information that Meta has about how their algorithms work. But based on the Haugen leaked memo and the Haugen testimony, our understanding is that these algorithms are dangerous in that if a poster posts two posts, one about Rohingya genocide and one about puppies, that the algorithms will promote, favor the... Yeah, but I understand the outcome. I think what we're getting at is the input. It's not because the substance of genocide. It's because apparently, if at all, because more people are clicking on it than the puppies. I mean, if more people are clicking on the puppies, they're going to push puppies out. I mean, it's not because they have an algorithm that says, hey, when you see genocide, let's give that an extra bump. These algorithms work. And again, this isn't how the algorithms worked prior to 2009. These are new algorithms. These algorithms are not neutral. They do not promote harmless content in the same way that they promote dangerous content. That's our allegation. Maybe we're wrong about that, but those are our allegations. Because you think there's actually something inherently substantively built in to the algorithm that promotes the dangerous activity. The way they work, the way they train users to create more and more dangerous content as opposed to more and more puppy content, because dangerous content gets more clicks, likes, reactions than puppy content does. Well, if it does. I mean, which is first. Those are our allegations. So there's also the dry-off opinion, which disturbs me a great deal, but how do you distinguish that one? I know you tried to, but it seems to me, well, tell me why that's not controlling here. Dry-off, again, it's the same distinction as I suggested on Gonzalez. This court in dry-off said, quote, plaintiff cannot and does not plead that defendant made suggestions regarding the content of potential user posts or contributed to making unlawful or objectionable user posts. So I think it goes back to the material contribution point. I think our strongest— I don't understand that statement, because the whole case was about the fact that they were referring— the person asked to be referred or asked something about how do you buy heroin, and they referred him to a group in which heroin was being sold. So there was a message that was communicated through the algorithms that if you want this, go there, and I don't understand what it means to say that they didn't do that. I think a recommendation—and if I'm over my time— It's a recommendation. I think there's a difference between recommendation algorithms, saying you might like this person who wants to sell heroin in Jacksonville, as opposed to algorithms that encourage drug dealers in Jacksonville to post about their wares on the site. I don't think Dyroff alleged that the Experience Project website there encouraged drug dealers to post, encouraged criminals to post, but it matched people up. If people were referred to them and they therefore got to sell their wares, that was encouraging them. It wasn't encouragement in the same way that we allege that the meta-algorithms train users. Can I ask one other question? Please. I suppose as an alternative way of looking at this case, what about the probable cause? The probable cause, proximate cause question. Proximate cause. Again, I think with respect to proximate cause, I think in Aledo, I think this case or this court said that proximate cause is generally a question for the jury, and I think this case is even less attenuated than the causal chain in Aledo. But as to the connection of these postings and algorithms to these people in their towns, there are some statements in the complaint, but there's no spinning out of how that happened. It just says something about the meta-promotion of the Rohingya genocide came to this town. We allege the algorithms incentivize people to create incitements to violence, and then the second prong of our causation chain is that incitements to violence were posted, and they were posted in Jane Doe 1's community at the time that her village was attacked, in Jane Doe 2's community at the time her village was attacked. I don't know if you would allege that. I would urge you to look at paragraphs 50 to 59 with respect to Jane Doe 1 and paragraphs 68 to 83 with respect to Jane Doe 2. Jane Doe 1, we allege that there were posts offering money to those who would rape and kill Rohingya in Jane Doe 1's community. With respect to Jane Doe 2, we talk about comments on the feeds of soldiers that were operating in Jane Doe 2's area in 2017 saying, shoot the Kalar, which is a derogatory term for Rohingya, shoot the Kalar, shoot them all, don't even let one of them escape, smash them all. And, yes, these are circumstantial. This is circumstantial evidence. But this is the best we can do at the pleading stage. META is uniquely in possession of the kind of evidence relevant to causation. They will have granular information about their users, about the users' locations, about the posts they were making, the posts they were reading, and we hope to be able to tile that together. But I think this is just another illustration of why we should get the district court's view on causation before this court tries to do that. Okay, thank you. We'll give you some time for that. Thank you, Your Honor. May it plea to the court. Excuse me. Kristen Lindsley for META. First, I'll start with statute of limitations, and I can address the other issues as well. The court should affirm the judgment because the district court was correct in holding that plaintiff's claims, which were filed in 2022, were barred based on the attacks in their village in 2012 and 2017. The parties agree that we're applying. I would appreciate you getting to the choice of law question, not necessarily now, but getting to the choice of law question. The choice of law on the 230? I can start right there. I don't mind doing that. I was actually, I know that Gonzalez case, I was arguing Tomna the same day on that crazy lengthy Zoom argument, so I have vivid memories of that. But, yes, the choice of law, of course, the court did address it in Gonzalez, although that's not a presidential opinion anymore. The district, I mean, I'm sorry, both the district court and the Second Circuit addressed it in the Force v. Facebook case as well. And the district court, of course, addressed the issue in Gonzalez as well. Magistrate Judge Ryu addressed it there. Every court that's addressed this issue has come out the same way, that no, California choice of law principles do not interfere with the fact that Section 230 is a domestic application of U.S. law that is applicable to and binding in U.S. courts, including federal courts and state courts. It's an admonition that courts shall not treat a person that's covered by the statute as a publisher or speaker of third-party content, and that C-2 as well applies where it applies in both sets of courts, federal U.S. courts and state U.S. courts. So there's no room for application of California choice of law principles to override that because it is a command of federal law that is applicable via the Supremacy Clause in both federal and state courts in the United States. It doesn't matter what law, underlying law, is being applied. In the Forrest v. Facebook case, the plaintiffs were arguing Israeli law. That was their underlying substantive law, and they only made the argument as to those claims. They said the claims that are – they didn't make the argument as to their claims under U.S. law. They made the argument as to their claims under Israeli law, that those claims somehow were not subject to Section 230, and the court said no because under the Kiobel and other line of cases, the RJR case, Supreme Court extraterritoriality cases, that was not an extraterritorial application of the law because it's Step 2 of Kiobel versus does it apply? Is it meant to apply to overseas conduct? No. Step 2, is this a domestic application? And the answer is yes, it's a domestic application because the focus of the law is on the treatment of ICS providers in U.S. courts with causes of action alleged against them in U.S. courts, regardless of the source of law. So that's – I think that's a correct analysis that this court engaged in, the Second Circuit engaged in, and I don't think there's any room in there for – How extensive was the argument on this point to the district court? In Gonzales? In this case. Oh, in this case. I don't remember it being extensive. I think it was mostly in the briefs. I don't remember if it came up at the oral argument. We had only one argument before Judge Gonzales-Rogers in this case. There was the original motion to dismiss, which she granted on both statute of limitations and causation, and she also said that she was skeptical of some of the other elements of their claim as well. There was that hearing, and then she didn't hold the hearing the second time around. She just granted our motion on the papers. So I don't recall the first hearing was some time ago, but I don't – Someone at the table. I don't think we recall whether this particular issue was talked about at argument, but it was definitely briefed below. Yeah. Where I'm headed with this, obviously, is wondering whether we should remand as suggested by your friend on the other side. I don't think for that issue, no, because it's a pure question of law. I don't think there's any reason why this court can't address it. It's fully briefed, and it's – But we would have to address the choice of law question in conjunction. If we were to rule on the alternative grounds, we'd have to address the choice of law question in conjunction with the 230 question. Sure, sure, but I don't think it – I mean, I think, like – It's a question of law. Yeah, and, you know, going back to the Planned Parenthood criteria for reaching issues at this level that weren't the subject of the court's decision below, we think that the court – there's every reason to, for the court, if it wishes to not rule on the statute of limitations, to address the alternative grounds. Planned Parenthood sets up, you know, a few criteria for doing that where it makes sense and it's more efficient for this court to just go ahead and decide the issue. One is the issue's purely legal, and we think most of the issues that we're presenting, Section 230, causation is really something that oftentimes is decided as a matter of law. It can be a question of fact, but court after court after court, including the California Supreme Court, has said, if it's apparent on the face of the complaint that the links between the chain of causation pieces are too attenuated, the court can and should rule as a matter of law on that. So, you know, I think that criteria of Planned Parenthood is met. There's an effect of a delay. This case – you know, the facts of this case happened a long time ago. There's no real reason for delay. Let me go back to the statute of limitations because, I mean, when I first read this, the district court opinion seemed fairly intuitive that there's no claim here. I started digging into the California cases, and that becomes a little less clear, and California has some nuances here. And I guess I'd be interested in your position on, you know, I assume your answer is yes to this question, but maybe explain why. Did the district court adequately look at California law specifically as opposed to just a general understanding of, you know, statute of limitations more generally? Yeah, the court did apply – correctly apply California law, and I think there's two key pieces that I would highlight for the court on that, and the court below did get this correct, is that the statute of limitations is subject to tolling under the discovery rule. It's not really tolling. It's just the claim doesn't accrue until the discovery occurs. Discovery occurs when you – and this is under Fox, but it's also under Jolly. Those are kind of the two bedrock California Supreme Court cases. If you've suffered an injury and you're aware that there's a wrongful cause, so you've suffered an injury and you're aware that there's a wrongful cause, you have a duty to investigate. Then you're charged with whatever the duty. But how would their duty to investigate here be implicated when they didn't even know about the Internet? Well, under Jolly, Jolly's probably the case I would point to most – that most clearly says this, is that if you've suffered an injury and there was wrongful conduct involved, it doesn't matter that you didn't have knowledge of facts underlying a cause of action. It didn't matter if you didn't know what wrongful conduct might have happened. It didn't matter if you didn't know who the defendant was. In that case, it was a DES baby. Her mother had ingested DES to avoid miscarriage, and that led to a series of well-documented illnesses. When was that case decided? Pardon me? When was that case decided? Jolly? Jolly was back in, I want to say, 1998, I think.  Oh, sorry, 1988. Yes, right. All right. 1988. Then we've had a fair amount of explication of California law, which does seem to say that you can have different start dates for different sources of injury. But I don't think that is consistent with what triggers the duty to investigate. In Fox, what the court held was that the plaintiff had a duty to investigate, which was triggered by her initial surgery and the problems with that surgery. She then did attempt to allege that she had investigated. She said it wouldn't have yielded anything, and the court said that was an insufficient complaint and upheld the dismissal of that complaint. That seems different than what we have here, if I'm understanding, because here their claim is we never even knew. I mean, why would we even assume that we had a duty to investigate? The difference is that they knew what the triggering event was that the exact same injury that they're currently complaining about, which was the attack on their village. Our village was attacked. We witnessed people being brutally treated. We had to flee the country because of our fear of similar violence happening toward us and other family members. We fled. That's the exact injury they're now complaining about. They knew about that injury when it happened in 2012 and 2017. But they didn't know. I agree with you. What they didn't know, allegedly, was what brought on that injury.  I don't know that they would have had any reason to know what brought on that injury. I mean, Fox says—I see. So your interpretation of Fox says, until the plaintiff discovers or has reason to discover the cause of action. But, again, I don't know why that wouldn't apply here to say that— I mean, they knew they had a cause of action against the people who perpetrated the violence, but they wouldn't have had any reason to suspect that they had a cause of action against— But they had a duty to investigate, and that's clear under Jolly and under Fox. Well, if they had a duty to investigate, and there's no way they would have found this if they investigated. But, see, I don't think that is correct, nor is it supported by what's in the complaint. The complaint—nothing in these cases says that you have to personally know or personally conduct investigation. You need to ask somebody, you maybe find a lawyer. The fact that you don't speak English— And in Burma, in this little village, why they're fleeing the Burmese. Well, no, Jane Doe 1 came to the United States. She doesn't allege she was in a village. The other one, Jane Doe 2, alleges that she was in a refugee camp with other people in her community. There's no allegation that she spoke with people in her community. Are you saying that it should have been— the limitations period, which was two years, I don't think she was in the United States by then, but I don't remember. In any event, are you saying it should have been sooner at least, even if it wasn't within the limitations period? Is that what you're saying? I'm saying she had a duty to investigate that was triggered by her witnessing the events that she witnessed. And when? As of 2017, there was a duty to investigate. As of 2012, in the case of Jane Doe 1, but she was a minor, she became 18 in 2014. So in her case, the duty to investigate— And why 2017? Well, the second plaintiff, Jane Doe 2, her village was attacked in 2017. So the duty was triggered by the witnessing of the injury. We're not arguing constructive suspicion. We're arguing actual suspicion of injury. And what Fox says is—and this is only the duty to investigate. The Court doesn't say, and the Supreme Court of California has made this clear, you don't have to discover your cause of action. You just have to conduct a reasonable investigation and plead what you did and plead that you didn't find anything at that time. They don't plead that. They just plead, oh, it would have been futile, it would have been worthless to even try. That's what they allege. But Fox—I mean, this is what gives me some pause, is the Fox language. Because Fox says the duty to investigate is triggered when the plaintiff has reason to suspect an injury and some wrongful cause. Right. And, I mean, I'm not sure—I mean, obviously when you're attacked, again, you know that they attacked, but I'm not sure you always think, oh, I need to go find out who instigated that. I need to find out what the conspiracy is behind it. The wrongful cause was the soldiers and other people who attacked the village. That's a wrongful cause under Fox. Well, that seems to go to a causation. That doesn't go to some—I mean, the wrongful cause of this happening here is the allegation, you know, however attenuated it may be, that Facebook actually put this into play. There's no dispute that the cause of the injuries, the immediate cause of the injuries was the soldiers attacking the village and committing violence. They can't allege that. They don't allege that that's not the root cause. Yes, but, of course, that's not the cause that they're alleging is the wrongful cause. That is to say— But they do. What they're alleging is that what brought this about was the facilitation by Facebook. So, of course they knew they were attacked. They got that. What they did not know was that Facebook's role in this. And what they're alleging is that the wrongful conduct of which they're complaining is Facebook's conduct, of which they had no knowledge. Yes, I understand that that's what they're saying. But the fact that they knew about— and there's issues with causation over that argument and that theory. But what they are saying is that Facebook, in some fashion or another, caused these bad people to do these bad things. So if you know about the bad people that did the bad things, under Jolly you have a duty to investigate what other bad people might have contributed. And in Jolly the court overruled a case that was called Kensinger. And in Kensinger the court had said that the statute of limitations didn't start to run until the plaintiff had knowledge of the facts of a cause of action against the defendant. And until that happened, the statute didn't run. You had to know the facts constituting the wrongful conduct by the defendant. The court in Jolly said that it's not California law that goes too far, that it actually—you don't have to know. And in Jolly itself, the Court of Appeals, the California Court of Appeal in Jolly, adopted the Kensinger review in Jolly in the DES case and said the plaintiff there had to know facts establishing the wrongdoing that she was suing on, the failure to test or the failure to warn. That was what the court below in Jolly said the plaintiff would have to know for the statute to run. And Jolly said, no, you just have to know you were injured in some fashion. You don't have to know who did it. But if you suspected you were wrong, that was enough to start the statute running. Then you had a duty to investigate. And, again, you don't have a duty to find the cause of action necessarily. But our position here is had she investigated, whether by talking to people in her community— And what would she have found out by talking to people in her community? What would she have found out? I mean, do you think that she would have found out that, hey, it turns out that, you know, there's this group on Facebook that is, you know, fomenting this? There's two things. One, yes, there's no allegation that if either of these plaintiffs— this is why you're supposed to have to allege what investigation you did. Because there's no allegation that if she had asked in her community, say Jane Doe II, who's in a refugee camp on her way out of the country, then she moved further, that she didn't ask around and say, hey, we just, you know, oh, my gosh, we just got out of that horrible situation. Why did that happen? How did that happen? And as Your Honor noted earlier, the complaint repeatedly alleges that both in 2012 and 2017, Facebook was alive with posts about this issue. And some of them were directed—I think it's paragraph 84 in the complaint— The point is if they had done some investigation, they would have discovered this. Yes. Someone would have said, I heard that posts were on Facebook. How do we decide that, though? Because they don't allege it. I think it's sufficient that they failure to allege. So your point is—and that is somewhat consistent with what the district court did. The district court just said you didn't allege any investigation that you did.  And then the other piece is that if they'd done further investigation, most people would consult the lawyer. Now, that—you know, you don't—no, but, I mean, you don't— California law is clear that there's not a different standard for people who have language issues or that are in motion or that— Edward Verma. Pardon me? Edward Verma. An illiterate person in a refugee camp has an obligation to consult an American lawyer. Yeah, right. Well, Jane Doe One was not in a refugee camp. She was here in the United States. In the statute of limitations period? Yes. She was here, I think, beginning—she doesn't allege when she landed, but she said she left in 2012 and came to the United States. There's no reason why she could not have consulted someone who might have referred her to a lawyer. And, yes, the law in California doesn't create a different standard for that. It doesn't have a lower standard if you don't speak English. That's a case we cited— He referenced opposing counsel the Kernan case about the blame— it's to protect the blamelessly ignorant. I had not focused on that case. Are you aware of that? Do you have a response to that? I don't think—I don't have the facts of that case in front of me. That was not a case that was prominently featured in the brief. As far as that quote goes, it's kind of—I don't think it proves anything. I didn't hear him say anything about the facts of that case that suggested there's a lower standard for people who don't— who allegedly don't have the wherewithal. But these are people who were in a community, and they could have asked people in their community. There's no allegation that there weren't people around that they could have consulted to say, hey, what happened here? How did this happen? And I think my friend in the prior argument said, off the record, if you Google, you find people who were in this community writing about it in the press. You know, people are not illiterate in this entire community. There's no allegation that that's true. I think that plaintiff alleges the illiteracy rate is lower in this community, but there certainly is nor could—is not nor could there be any allegation that this entire community was illiterate and had— And there were some—in 2012 and 2013, there were some writing— I saw something later, but it was a person that had been clearly watching the posts as they were happening. He said he was 11 years old. He was looking on Facebook. He was seeing these posts, and he was, you know, upset about it. And so I just—I don't want to go off the record in an inappropriate way, but I'm just saying there's no allegation that there wouldn't have been people that they could talk to about this. And also, if they had gone further and done—even had somebody do a simple Google search, they would have popped up all this 2018 stuff, which is why we say the statute begins to run at the latest in 2018, because there was a U.N. report in their native language that made a link between military use of Facebook in these atrocities, and there were statements by people at Facebook acknowledging that the Facebook— I'm sorry, at META, that the Facebook platform was used by the military in these ways. And so that was, again, sufficient to, you know, trigger the statute and the need to bring a lawsuit in a timely way within the statutory period. Do you want to briefly address the merits of the Section 230 issue, and in particular the distinctions that your opponent suggested with regard to the most relevant precedents? Yes, Your Honor, of course. The—I mean, this case, I think, is a textbook case of application of Section 230. It's squarely within DIRAF. It's squarely within a state of bride. And, you know, to the extent even that some of the cases have suggested at all turns that a duty to moderate, which is something that's in Calise, and that's something that Holloway says, and Lemon as well, I think, it obviously is true of their claims. They're saying there shouldn't have been these algorithms recommending content. There shouldn't have been the ability to post likes and shares and to have comments that were of this incendiary nature. You should have had more monitors. They literally allege there should have been more Burmese-speaking monitors to be looking at this content as it was going by. So there couldn't be a more textbook case. Now, I just—I do want to level set a bit on what counsel is saying about this. I think his answer to Section 230 and to some of the causation issues and other issues as well is, well, MEDA was inciting people to post this harmful content. MEDA was encouraging people to post this harmful content. So that is just not borne out by the allegations of the complaint, nor could it be borne out because— He wasn't saying they were inciting them in some intentional way directed at the Rohingya in particular, but if I can understand the distinction he was trying to make, it is that the algorithms here were not neutral in the sense that they promoted and directed people towards the more inciting content over less inciting content. And in that way sort of blew up the communication system so that it was focusing on the hateful and terrorist-promoting material because of the way the algorithm was structured. Not simply because they were referring people, and prioritizing communications based on their insightfulness essentially. Yeah, that's right. That's what they're saying in the brief, and I don't think that's really what they allege, but let me just speak to that directly. First of all, there's two things that they seem to be saying. One is the algorithms are serving content on people in a disproportionate way based on engagement. Then they say because harmful content is stickier and more engaging, more people engage with harmful content, therefore the algorithms serve more of that on those people, and maybe on other people as well. That there's more engagement— The question is whether that's a sufficiently distinct allegation from the ones in Dreyhoff and Google versus Gonzales and Estate of Bride that the Section 230 determinations in those cases are not binding. Yes, because in our view it is not. It is the same basic thing that was being alleged in Dreyhoff, which is that the algorithms were steering people, including this young man, toward groups, recommending groups that had to do with heroin, either because someone had expressed an interest in heroin or otherwise, and were giving harmful recommendations to people, and then serving on him— I'm trying to work with the distinction to see if it works, and I guess the distinction would say, but Dreyhoff was not a situation in which you were more likely to get directed to a heroin salesman if he asked for a heroin salesman than to a puppy salesman if he asked for a puppy salesman. But they don't allege that here either. That's the problem. All they allege is the same thing. Francis Haugen said, oh, engaging content is more sticky, and more people engage with engaging content, and therefore the algorithm favors that content over others. If, as we had the hypothetical before, if more people were engaging with puppies, the algorithm would do exactly that with the puppies. So it is not different from Dreyhoff, and there is no allegation that the algorithm was directly engaged with any of the posts that are alleged in the complaint. So just even that is not alleged, that the algorithm recommended any of these posts to anybody or otherwise directed that any of these posts be created. The other thing that is relied on in the complaint is likes. So this is the incentive and the encouraging and the inciting argument. Well, you're inciting the bad posts because you're encouraging people to post them because the system rewards people who post these things. How does it reward them? It's a neutral system. Yes. It's not only neutral, but it's entirely third-party rewards. Every single like and comment and share is coming from another third-party user. Those are not coming. If you like this, you like that. I mean, it just seems so clear to me that that's outside communication and shouldn't be covered by Section 230 that I get extremely frustrated, but I understand that that is the law of the circuit. But clearly there are communications coming from Meta to people that are telling people who look at one insightful post that you should look at these other insightful posts. Is that not right? I mean, most of it pops up on your feed. It doesn't pop up on my feed because I don't look at terrorist stuff. So what does pop up on my feed? A lot of innocuous stuff pops up on my feed. But if people are looking at terrorist content, and this is the premise the Supreme Court assumed was true for purposes of Tomna, that if you like terrorist content, you're going to get more of it. If you like puppies, you're going to get more of them. And that's certainly my experience. I get couches from Pottery Barn. From Meta, I don't understand. They're telling you if you like this. But there's no allegation in this case that any of the posts that are featured in the complaint were recommended by anybody. These are posts that people posted, and then someone else liked or commented on them. And the posting and the comments are all third party. They're not coming from Meta, and they're not generated by the algorithms. They're generated by the people who wrote them or posted the likes or posted the comments. That's true. I'd have to read the complaint very carefully, then it's an easy case. I think it's an easy case because if you dig down beneath the rhetoric, and there's a lot of rhetoric in there, but I don't think the court has to take the rhetoric as true. If you dig down what you find when you're looking for the so-called incitement are the likes and the shares and the organic posts to which those likes and shares were attached. Okay. Thank you. We've taken you over, but your time is gone. We'll give two minutes for rebuttal. Thank you, Your Honors, and I will try to be brief. Let me just start again with the statute of limitations and Jolly and Fox. And I think it's important to note that Meta doesn't cite a case, in contrast to Fox and EFAB and Evans, Meta doesn't cite any cases where knowledge of someone's wrongdoing triggered an obligation to investigate whether someone else was a substantial factor. Well, but I think the argument I'm focused on is sort of where the district court went, which is there was no allegations in the complaint of any attempt to investigate. There was no suggestion that they actually went out and said, hey, what happened or, you know, that this stuff wouldn't have been available had they done some investigation. So why isn't that? That does seem to distinguish this or potentially distinguish this from Fox. I don't think it distinguishes it from Fox, but because Fox expressly rejected this idea. There had been a previous case, Bristol-Myers Squibb, a California appellate court case, that said that it adopted a rule of, quote, imputed simultaneous discovery, that if you are harmed by one person, you're deemed to have, when a plaintiff has caused to sue one defendant, the statute of limitation runs as to all defendants. And Fox rejected that rule. But I think where there seems to be a separation between your theory and your opponent's theory is whether there's a duty to investigate to begin with. And Fox seemed to, looking at it quickly just now again, say that there is, in fact, a duty to investigate. The question is what you have a duty to have found if there were two defendants and two causes for the injury. But at the outset, there is a duty to at least try to find out who's causing your injury. Do you disagree with that? I disagree somewhat with that in terms of I don't think there is a ‑‑ there's only a duty to investigate if you have a reason to investigate. So if there ‑‑ He knows that terrible things happened. He knows terrible things happened. And there was injury and somebody caused it. All right? So she has some duty. She thinks the Burmese military and civilian militias did it, period. She's not on ‑‑ I don't think it's reasonable to ‑‑ So what your view is that she has no further duty even to investigate whether somebody else was responsible too? I don't know that Fox says that. I don't think it's reasonable. And, again, I think a jury gets to decide whether it's reasonable.  I mean, you might be true ‑‑ it might be true that she has no duty to investigate further as to the actual harm that she knows of because she knows of that harm. But if you're talking about a third party, I mean, you have some duty to investigate. Now, the problem here is we don't know exactly what would have come about in that investigation. But the district court said the problem here was that there was no allegation in the complaint that any investigation was done. Right. But I think that's where the district court got it wrong. Fox says, simply put, in order to employ the discovery rule to delay a cruel of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused which presumably she did, must conduct a reasonable investigation of all potential causes of that injury. So that's why I'm asking whether there wasn't when she knew something terrible had happened. I mean, this is also in the abstract and silly in one way because the notion that this person is, you know, a little town fleeing from her life was going to investigate anything is really kind of foolish. Exactly, and I think that's an important point not to overlook. And I will just say that the failure to investigate does not bar a claim. It's not a bar on the claim. It just simply charges the plaintiff with knowledge that they would have found. Well, no, it is a bar as to statute of limitation. You don't get equitable tolling if you don't investigate. I think that's what Fox says. I think, to be frank, I think there's some sloppy language in Fox. But if you look at what happens in Fox, and confirmed by Evans and EFAP, if one person hurts you, that doesn't trigger the statute of limitations on someone else hurting you. Well, yes, because maybe you couldn't have found it, but not because you didn't have a duty to investigate. That's what I'm trying to separate out. Because then Fox goes on to say, More broadly stated, if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing, when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postponed to the accrual of the statute of limitations on the newly discovered claim. So, again, there is at the outset a duty to investigate as to whether there's another cause. You can't find it out at that point, and you can only find it out later. But, I mean, we don't have any knowledge here at all. They weren't looking to sue anybody when they were fleeing to the United States. The ultimate question is, what should she have done? She should have asked questions and said, Do you know anything about this? That seems like, I mean, not too high of a task, even for someone who is illiterate, to ask within the community. And we allege that this connection between META and the violence wasn't well known in the community. And that allegation was discarded by the district court. She just said, I'm not going to credit that. And I think that's a serious allegation. I don't know why. Oh, I miss it. The district court actually said, I'm going to discredit that? She said, I can find it in my group. Okay, I'll go look at that, because I'm not sure what basis she would have to discredit that. I agree. We believe she discredited it. She drew allegations against it, or drew inferences against us. We allege specifically that it was not well known. Well, yeah, so that means, okay. All right. No, this is helpful. Anyway, did you have anything else you wanted to say? I just want to make one point on causation. We're on a motion to dismiss. Our theory is plausible. The chairman of the United Nations fact-finding mission said so. He said META played a, quote, determining role in the genocide. Amnesty International said that this is plausible. META, quote, substantially contributed to the human rights abuses against the Rohingya. And META employees said so. One of the whistleblowers said, I, working for Facebook, had been a party to genocide. So I think our allegations, like I said, causation, we're doing the best we can with circumstantial evidence here. But I think these are plausible allegations. META employees are taking a lot of responsibility on his head. But anyway. All right. Well, thank you very much. And thank you to both parties, all counsel, for your work in this complicated case. And I appreciate the help you've given the court. The court will submit the case, and we're done for the day. Thank you, Your Honor.
judges: FLETCHER, BERZON, NELSON